**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FIVE-STAR AUDIOVISUAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-5271 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| UNIQUE BUSINESS SYSTEMS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Five-Star AudioVisual provides audiovisual services to high-end commercial clients. It needed newer, better software to help run its business, so it turned to Unique Business Systems ("UBS") for a solution. UBS promised that it could deliver a software system that would meet Five-Star's business needs. UBS gave a series of presentations to Five-Star over a period of months, lauding the capabilities of its R2 software.

In the end, Five-Star was sold. But Five-Star now believes that it was sold a bill of goods.

The software didn't work as promised. In fact, the software didn't work at all. Five-Star paid hundreds of thousands of dollars for the software, and in the end, it received months of delays, frustration, and disappointment. Five-Star eventually terminated the contract.

Five-Star responded by filing suit against UBS, bringing nine claims. UBS, in turn, moved to dismiss the complaint for failure to state a claim.

For the reasons stated below, the motion to dismiss is granted in part and denied in part.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Five-Star AudioVisual, Inc. provides audiovisual services to high-end hotels, resorts, and conference centers. *See* Cplt., at ¶ 7 (Dckt. No. 1). Five-Star used to run its business on a legacy software system called Av$tar. *Id.* at ¶ 8. That system had only basic functionality, and it was becoming outdated. *Id.* Five-Star wanted to rebuild the system or replace it with a new, off-the-shelf software package. *Id.*

In early 2022, Five-Star began looking for third-party software developers and potential software solutions. *Id.* at ¶ 9. That's when Unique Business Systems Corporation ("UBS") entered the picture.

In March 2022, three UBS employees – Ramon Garcia, Shawn Pasco, and Vikram Khosla[1] – began pitching UBS's R2 software as a possible solution for Five-Star. *Id.* at ¶ 10. They made the pitch through a series of online video conferences over several months, including conferences on April 15, May 6, May 18, and November 11, 2022. *Id.* Representatives from Five-Star attended each meeting. *Id.*

---

[1] The complaint spells Vikram Khosla's name differently at different points. Most of the time it is "Khosla," one time it is "Kholsa." *Compare, e.g.*, Cplt., at ¶ 14 (Dckt. No. 1), *with id.* at ¶ 15. This Court will assume that it should be spelled "Khosla."

During those meetings, Garcia, Pasco, and Khosla represented that the R2 software was a "highly configurable out-of-the-box software solution that could be used in daily audiovisual management, inventory management[,] and billing." *Id.* at ¶ 11.

Five-Star and UBS later met for a two-day demonstration from January 17 to 18, 2023, at the Sea Island Resort in Georgia. *Id.* at ¶ 12. At the meeting, Garcia represented to Five-Star that the R2 system could be "configured to meet the needs of Five-Star's industry including customization to Five-Star's unique business processes and business requirements." *Id.*

Garcia also "displayed the points of configuration and movement of modules to meet Five-Star's business requirements including[] sales modules, inventory flow modules, and client billing." *Id.* at ¶ 13. Lastly, Garcia and Khosla showed the features of the R2 software, including "its sales RFP module, the flow of putting clients' information into the software, adding inventory to sales orders, transferring inventory equipment between properties, and billing clients." *Id.* at ¶ 14.

As the complaint tells it, the UBS employees left out a few things. They didn't tell Five-Star that the R2 software from the demonstration was not "off-the-shelf" software, but rather was customized demonstration software. They didn't reveal that the R2 software would require many modifications to make it operational for Five-Star. *Id.* at ¶ 15. They also didn't divulge that those software modifications were expensive. *Id.* At bottom, the R2 software was focused on inventory management, and not on customers, billing, or logistics. *Id.* at ¶ 17.

Five-Star didn't know the full story. Five-Star believed UBS's representations that the R2 software was suitable for its business needs and that the R2 software was a highly configurable, off-the-shelf software solution without the need for expensive or extensive modifications. *Id.* at ¶ 18.

After much discussion, the parties inked a deal. Five-Star signed a "UBS R2 License and Service Agreement" and a "R2 License and Hosting Order Form" (collectively, the "Agreement"). *Id.*; *see also* Agreement (Dckt. No. 1-1).

Under the Agreement, UBS licensed the R2 software to Five-Star. *See* Cplt., at ¶ 19 (Dckt. No. 1). Five-Star purchased recurring services such as hosting, maintenance, and subscription modules for the software. *Id.* Five-Star also purchased implementation services. *Id.*

To date, Five-Star has paid UBS over $990,000 (and counting) in software-licensing fees, annual cloud-hosting fees, support fees, data-base-support fees, and implementation fees. *Id.* at ¶ 20.

The implementation began on March 9, 2023, with a go-live date of August 1, 2023. *Id.* at ¶ 21.

Things didn't go smoothly. Far from it. The implementation of the R2 software was largely a failure. UBS struggled to implement a system for Five-Star that could function as UBS said it would during the sales process. *Id.* at ¶¶ 22–23.

At some point, Five-Star communicated its dissatisfaction to UBS about the implementation progress, and shared its concerns about the R2 software system's readiness. *Id.* at ¶ 25. In July 2023, Five-Star identified "significant issues" with the software, making the initial August go-live date unattainable. *Id.* at ¶ 26. UBS pushed back the go-live date to December 1, 2023. *Id.* at ¶ 27.

December 1 came and went, and the site did not go live. *Id.* So, Five-Star hired a new project manager to work with UBS to deliver functioning R2 software. *Id.* The new project

manager found that UBS had made no significant progress, and the go-live date was pushed back again to April 1, 2024. *Id.*

At some point, Five-Star complained that the R2 software was focused solely on inventory management and not on billing, logistics, or customers. *Id.* at ¶ 29. Five-Star also asked UBS to fix some issues with the R2 software related to, among other things, billing and user-testing acceptance. *Id.* at ¶ 30.

In December 2023, UBS sent a team of project managers to Five-Star's management conference in San Diego to better understand Five-Star's business processes and workflows. *Id.* at ¶ 31.

At the conference, UBS gave a presentation that touted UBS's success. *Id.* at ¶ 33. The presentation did not explain what UBS was doing or could do for Five-Star. *Id.* Five-Star's team asked questions and complained to UBS about the new software. *Id.* at ¶ 34. But UBS was "unprepared to address Five-Star's concerns and was unable to represent that Five-Star could implement a system that would work as represented." *Id.* at ¶ 32.

At that point, Five-Star thought that the then-current go-live date of April 1, 2024 was unattainable due to UBS's inadequate and incomplete training, incomplete system testing, and inaccuracies in inventory data. *Id.* at ¶ 35. And after internal discussions, Five-Star realized that the project was not salvageable. *Id.* at ¶ 36.

Five-Star cut its losses and threw in the towel. Five-Star terminated the Agreement in March 2024. *Id.* at ¶ 37. This lawsuit followed.

Five-Star brings nine claims: (1) fraudulent misrepresentation, (2) negligent misrepresentation, (3) fraud in the inducement, (4) breach of contract, (5) breach of the covenant of good faith and fair dealing, (6) breach of express warranty, (7) unjust enrichment, (8) violation

of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/01 *et seq.*, and (9) violation of New York General Business Law § 349.  *Id.* at ¶¶ 38–129.

UBS moved to dismiss each of the nine counts for failure to state a claim.  *See* Mtn. to Dismiss (Dckt. No. 11).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Iqbal*, 556 U.S. at 678.

## Analysis

UBS moved to dismiss all nine claims.  The Court will address them one by one.

## I.    Fraud (Counts I and III)

The Court will start with the two fraud claims.  Five-Star brings a fraudulent-misrepresentation claim (Count I), and a fraud in the inducement claim (Count III).  *See* Cplt., at ¶¶ 38–50, 71–81 (Dckt. No. 1).

In the fraudulent-misrepresentation claim, Five-Star alleges that Garcia and Khosla knowingly made false representations during the four online video conferences and at the

meeting in Sea Island, Georgia. *Id.* at ¶¶ 39–40. Garcia and Khosla falsely represented that UBS's R2 system "was an out-of-the-box software solution that had the specific capability and functionality to meet Five-Star's business requirements without expensive customization or modification." *Id.* at ¶ 39. Five-Star relied on those misrepresentations in purchasing services from UBS. *Id.* at ¶¶ 41–43.

Similarly, in the fraud-in-the-inducement claim, Five-Star alleges that Garcia and Khosla knowingly made false representations during the meetings. They misrepresented that UBS "possessed the capability to design, implement, and deliver a fully integrated ERP software system with the specific capability and functionality to meet Five-Star's business requirements and address Five-Star's business processes and to do so within eight months of the start of the project." *Id.* at ¶ 72. Five-Star relied on those misrepresentations. *Id.* at ¶ 78.

### A.    Pleading

The first question is whether the complaint pleads fraud with particularity. It does.

To state a common-law fraud claim, a plaintiff must allege "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (quoting *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996)).

Rule 9(b) raises the bar when it comes to pleading a fraud claim. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). A plaintiff "must describe the who, what, when, where, and how of the fraud – the first paragraph of any newspaper story." *United States ex rel. Presser v. Acacia*

*Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (cleaned up). But the Seventh

Circuit has cautioned that courts must not "take an overly rigid view of the formulation,"

recognizing that the information in the first paragraph of a newspaper story "may vary on the

facts of a given case." *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen

Co.*, 631 F.3d 436, 442 (7th Cir. 2011).

UBS thinks that Five-Star's fraud claims do not meet the heightened pleading standards

required by Rule 9(b). The Court will address each fraud claim in turn.

First, UBS thinks that Five-Star's fraudulent-misrepresentation claim does not

sufficiently plead the "what" – *i.e.*, what the purported misrepresentations were. *See* Mtn. to

Dismiss, at 5 (Dckt. No. 11). As UBS sees it, Five-Star's allegations are "vague[]," and do not

rely on any particularized language. *Id.*

This Court reads the allegations differently. Five-Star alleged that "Ramon Garcia and

Vikram Khosla represented to Five-Star that UBS's R2 system was an out-of-the-box software

solution that had the specific capability and functionality to meet Five-Star's business

requirements without expensive customization or modification." *See* Cplt., at ¶ 39 (Dckt. No. 1).

Similar allegations appear throughout the complaint. Five-Star alleges that, during the

online video conferences on April 15, May 6, May 18, and November 11, 2022, "Vikram

Khosla, Shawn Pasco[,] and Ramon Garcia represented that the UBS R2 software was a highly

configurable out-of-the-box software solution that could be used in daily audiovisual

management, inventory management[,] and billing." *Id.* at ¶¶ 10–11.

Five-Star also alleged that, during the Sea Island demonstration from January 17 to 18,

2023, Garcia represented that "the R2 system could be configured to meet the needs of Five-

Star's industry[,] including customization to Five-Star's unique business processes and business

requirements." *Id.* at ¶ 12. Garcia did so by "display[ing] the points of configuration and movement of modules to meet Five-Star's business requirements including[] sales modules, inventory flow modules, and client billing." *Id.* at ¶ 13. And Garcia and Khosla "showed features of R2, including its sales RFP module, the flow of putting clients' information into the software, adding inventory to sales orders, transferring inventory equipment between properties, and billing clients." *Id.* at ¶ 14.

According to the complaint, Five-Star didn't know that the software that Garcia and Khosla demonstrated was "merely demonstration software, not software using live data in a production environment." *Id.* at ¶ 16. And likewise, Garcia and Khosla never disclosed that, while the software was highly configurable, it would not be easy for Five-Star to make the software work for its purposes. *Id.* at ¶¶ 18, 39.

Five-Star didn't know that the configurations were expensive, and that Five-Star would need a lot of configurations to make the software satisfy its needs. Plus, the demonstration software was not the base "off-the-shelf" software (*i.e.*, the version without the expensive configurations). *Id.* at ¶ 15. In reality, "the R2 software was almost solely focused on inventory management and not on customers, billing[,] or logistics." *Id.* at ¶ 17.

Those allegations are enough to meet the heightened pleading standards of Rule 9(b). Five-Star alleges the "who" (Garcia and Khosla as representatives of UBS), "what" (*e.g.*, the misrepresentations that the R2 software was a highly configurable, out-of-the-box software solution that would meet its needs), "when" (during the four online video meetings, as well as at the Sea Island demonstration), "where" (same), and "how" (through false statements and misleading demonstrations) of the fraud.

Five-Star also pleads the other elements of common-law fraud. Five-Star alleges that Garcia and Khosla knew that the representations were false when they made them, and that they made the misrepresentations with the intent that Five-Star would rely on them when deciding to do the deal with UBS.[2] *Id.* at ¶¶ 40–41. Five-Star also alleges that it relied on those misrepresentations and suffered damages as a result. *Id.* at ¶¶ 42–50. That's enough to state a claim for fraudulent misrepresentation.

In the alternative, UBS points to an internal inconsistency in the complaint. As UBS sees it, Five-Star cannot allege that UBS "'never disclosed . . . that configurations of the software were expensive modifications' or the 'number of modifications' needed," while also alleging that UBS "affirmatively represented that the R2 software 'had the specific capability and functionality to meet Five-Star's business requirements without expensive customization or modification.'" *See* Mtn. to Dismiss, at 5 (Dckt. No. 11) (quoting Cplt., at ¶¶ 15, 39 (Dckt. No. 1)).

The line between a misrepresentation and an omission can be fuzzy on the margins, especially when it comes to half-truths. Here, the Court sees no inconsistency. The point is that Five-Star didn't tell the full story when it described the software. At this early stage, that's enough to put the ball in play.

It wouldn't matter if Five-Star's two theories of fraudulent misrepresentation were partially inconsistent. The Federal Rules expressly allow parties to plead in the alternative. *See* Fed. R. Civ. P. 8(d)(2)–(3); *see also Guarantee Tr. Life Ins. Co. v. Am. United Life Ins. Co.*, 2003 WL 23518661, at *2 (N.D. Ill. 2003) (recognizing that a plaintiff can "plead alternative theories of recovery and damages, inconsistent with one another" if he is "legitimately in doubt about the

---

[2] Rule 9(b) does not require pleading with particularity when it comes to intent or knowledge.

facts in question") (quoting *American Int'l Adjustment Co. v. Galvin,* 86 F.3d 1455, 1461 (7th Cir. 1996)).  Five-Star's fraudulent-misrepresentation claim survives.

The same conclusion applies to the fraud-in-the-inducement claim.  Five-Star alleges that Garcia and Khosla "represented to Five-Star that UBS possessed the capability to design, implement, and deliver a fully integrated ERP software system with the specific capability and functionality to meet Five-Star's business requirements and address Five-Star's business processes and to do so within eight months of the start of the project."  *See* Cplt., at ¶ 72 (Dckt. No. 1).

UBS believes that Five-Star has not pleaded the "when" and "where" of this allegation.  Again, that argument doesn't get very far.  The complaint points to specific meetings, including the four online video conferences that took place on April 15, May 6, May 18, and November 11, 2022, as well as the Sea Island demonstration on January 17–18, 2023.  *Id.* at ¶¶ 10–15.

UBS wants more details.  In its view, it is "unclear whether this purported representation was made at one of the 'series of online video conferences' . . . [or] at the 'two-day demonstration from January 17 to January 18, 2023' . . . or at another meeting not identified by Five-Star."  *See* Mtn. to Dismiss, at 6–7 (Dckt. No. 11).  But Five-Start does not need exactitude when it comes to timing.  Pleading with particularity does not require perfect precision.  And in any event, if UBS wants more details, then discovery can fill in the gaps, if any.

In sum, Five-Star has adequately alleged a claim of fraud in the inducement.

## B.    Overlap with Breach of Contract

Next, UBS argues that the fraud claims are duplicative of Five-Star's breach-of-contract claim.

As UBS points out, a fraud claim cannot rest on the same ground as a claim of breach of contract. That is, a failure to perform under a contract is the basis for a breach-of-contract claim, not a fraud claim. After all, "the mere fact that a defendant promised something and then failed to do it . . . occurs every time a defendant breaches a contract." *Zankle v. Queen Anne Landscaping*, 724 N.E.2d 988, 998 (Ill. App. Ct. 2000). To bring a fraud claim, a plaintiff must allege a "fraudulent act distinct from the alleged breach of contract." *See Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011).

So, the Court must first determine whether Five-Star alleges a fraudulent act or omission that is distinct from the alleged breach of contract. The Court concludes that the fraud claims are sufficiently distinct from the breach-of-contract claim.

Five-Star's fraud claims rest on alleged misrepresentations that UBS made about the *potential capabilities* of UBS and its R2 software. Five-Star says that UBS lied by representing that the R2 system was an "out-of-the-box software solution that had the specific capability and functionality to meet Five-Star's business requirements without expensive customization or modification." *See* Cplt., at ¶¶ 39–40, 72 (Dckt. No. 1).

In other words, Five-Star says that UBS engaged in fraudulent salesmanship to get Five-Star to enter the contract. So, the fraud claims are about what UBS said it *could* do *before* the parties entered the contract.

Meanwhile, the allegations in Five-Star's breach-of-contract claim are not about what UBS said it *could* do, but about what UBS promised it *would* (and didn't) do. Five-Star alleges that UBS breached the contract by "fail[ing] to implement, host[,] or upgrade the R2 software," and "providing an incomplete and unusable product that was missing key functionality." *Id.* at ¶¶ 84–85.

In other words, Five-Star says that UBS didn't deliver what it promised in the contract. So, the breach-of-contract claim is about what happened *after* the parties entered the contract.

True, the fraud claim and the breach-of-contract claim sound similar. Five-Star's fraud claim is that, before entering the contract, UBS overstated its capabilities when it sold Five-Star on its services. Five-Star's breach-of-contract claim alleges that UBS failed to deliver on its promises under the contract.

But those claims are different, based on the timing of the underlying facts and their relationship to the contract. The fraud claim alleges that UBS made fraudulent misrepresentations about what it *could* do *before* Five-Star and UBS entered the contract, to get Five-Star to enter the contract. So, the fraud claim is not based on any failure to perform. It is based on false statements made before any of the parties had any obligation to perform.

On the other hand, the breach-of-contract claim alleges that UBS failed to meet its contractual *obligations*, *after* the parties entered the contract.

Courts in this district have faced similar pre-contractual fraud claims and breach-of-contract claims, and have allowed both of them to proceed.

A good example is *Dyson, Inc. v. Syncreon Technology (America), Inc.*, 2019 WL 3037075 (N.D. Ill. 2019). Dyson uses third-party providers of logistics services to handle inventory distribution. *Id.* at *1. Dyson entered into a contract with Syncreon for Syncreon to provide logistics services. *Id.*

Unfortunately, the process of transitioning Dyson's business to Syncreon was difficult. *Id.* Dyson alleged that "deliveries were delayed and incorrectly shipped, customers were improperly billed, and Syncreon's record-keeping and labeling were deficient." *Id.* Months later, Dyson terminated the agreement. *Id.*

13

Dyson filed suit and alleged that Syncreon breached the contract by "committing serious errors and failing to devote adequate resources to the performance of its contractual obligations." *Id.* Dyson also brought a fraud claim that Syncreon "made false statements about its capabilities to induce Dyson to enter" the contract. *Id.*

On summary judgment, Syncreon argued that the fraud claim was foreclosed under *Greenberger* because it was not distinct from the breach-of-contract claim. *Id.* at *5. It pointed to a contractual provision that said "[Syncreon] represents that they are sufficiently experienced, properly qualified, and equipped to perform the [s]ervices and will devote the time, personnel, and resources necessary to perform the services." *Id.* Syncreon argued that "its allegedly fraudulent misrepresentations are really unfulfilled contractual promises and that Dyson must therefore be limited to a cause of action in contract." *Id.*

In other words, Syncreon made the same argument that UBS makes here. As Syncreon saw it, the fraud claim – that Syncreon made material misrepresentations to trick Dyson into entering the contract – was not distinct from the claim that Syncreon later failed to perform under the contract.

The district court disagreed. The fraud claim rested on representations about Syncreon's overall capabilities. "Syncreon's alleged fraudulent misrepresentations extend beyond an unfulfilled promise to perform its contractual obligations. Dyson contends, for example, that Syncreon induced it to enter the contract by misrepresenting its experience in retail logistics and its existing technological capacity. Those allegedly false statements are not promises to perform obligations under the contract, and allowing Dyson to pursue a fraud claim based on those statements does not supplement its breach of contract claim 'with a redundant remedy.'" *Id.* (quoting *Greenberger*, 631 F.3d at 399).

14

In short, the district court reasoned that the fraudulent statements made before entering the contract were distinct and actionable apart from the failure to perform under the contract.

Judge Dow reached the same conclusion in *Boyd Group (U.S.) Inc. v. D'Orazio*, 2015 WL 3463625 (N.D. Ill. 2015). Boyd Group, a large operator of collision-repair centers, wanted to acquire D'Orazio's business, which was a leader in the collision-repair industry. *Id.* at *1.

There was one hiccup: D'Orazio's business had a preexisting contract to purchase automative paints exclusively from Sherwin-Williams, and Boyd wanted out. *Id.* at *2. One of Boyd's conditions to closing the deal was that D'Orazio's business would terminate the contract with Sherwin-Williams and pay any associated costs of doing so. *Id.*

In response, D'Orazio's business represented that Sherwin-Williams had agreed to release the contract. *Id.* And then Boyd "closed on the anticipated closing date in reliance on D'Orazio's counsel's representations . . . that the Sherwin-Williams release effectively had been obtained." *Id.* at *3.

Unfortunately, D'Orazio was unable to terminate the contract with Sherwin-Williams. *See id.* So, Boyd had to foot the bill and pay Sherwin-Williams $9.5 million for a release from the contract. *Id.*

Boyd brought a fraud claim and a breach-of-contract claim, among other claims. *Id.* Boyd's fraud claim alleged that D'Orazio made false statements about Sherwin-Williams's willingness to terminate its contract with D'Orazio. *Id.* Meanwhile, Boyd's breach-of-contract claim alleged that D'Orazio breached the contract by not terminating or obtaining a release from the Sherwin-Williams contract. *Id.*

D'Orazio moved to dismiss the fraud claim. D'Orazio made the same argument that UBS makes here and now – that the fraud claim was not sufficiently distinct from the breach-of-contract to be brought as a separate claim.

The district court in *Boyd* agreed that a fraud claim must rest on a "fraudulent act distinct from the alleged breach of contract." *Id.* at *8 (citing *Greenberger*, 631 F.3d at 401). But the court determined that the fraud claim was distinct enough to avoid dismissal.

"[T]he fraud claim is premised on alleged false statements that were made prior to the closing about the status of the Sherwin-Williams release and D'Orazio's ability to eventually obtain it. These alleged representations qualify as fraudulent misrepresentations separate and apart from D'Orazio's breach on an alleged obligation to terminate the [c]ontract, unlike those that were found to be insufficient in *Greenberger*." *Id.* at *9.

This case is like *Boyd* and *Dyson*. Again, Five-Star's fraud claims are based on allegedly false misrepresentations that UBS made before entering the contract. *See* Cplt., at ¶¶ 39–40, 72 (Dckt. No. 1). Meanwhile, Five-Star's breach-of-contract claim focuses on UBS's actual failure to perform. *See id.* at ¶¶ 84–85.

The fraud claims allege that UBS misrepresented its *capabilities*, which occurred *before* the parties entered the contract. Five-Star alleges that UBS lied and said that UBS's "R2 system was an out-of-the-box software solution that had the specific capability and functionality to meet Five-Star's business requirements without expensive customization or modification." *Id.* at ¶¶ 39–40. Those are allegations about what UBS falsely said it *could* do, and those promises don't feature in the contract at all. For example, the contract doesn't say that UBS had to provide an out-of-the-box software solution for Five-Star.

Meanwhile, the breach-of-contract claim alleges that UBS failed to perform its contractual *obligations*, which occurred *after* the parties entered the contract. Five-Star alleges that UBS failed to "implement, host[,] or upgrade the R2 software," and instead "provid[ed] an incomplete and unusable product that was missing key functionality." *See id.* at ¶¶ 84–85.

So, like in *Boyd*, the fraud claim "is premised on alleged false statements that were made prior to the closing [of the contract] . . . separate and apart from [UBS's] breach on an alleged obligation [of the contract]." *Boyd*, 2015 WL 3463625, at *9. Allegations that UBS overstated its experience and capabilities to induce Five-Star to enter into a contract are independently actionable as fraud claims, separate and apart from any ultimate breach of the resulting contract. *See Dyson*, 2019 WL 3037075, at *5. As such, dismissal of Five-Star's fraud claims is not warranted under *Greenberger*.

In sum, the fraud claims overcome the heightened pleading standard of Rule 9(b), and are sufficiently distinct from the breach-of-contract claim. Both fraud claims survive.

## II. Negligent Misrepresentation (Count II)

Five-Star's negligent-misrepresentation claim has a lot in common with the fraudulent-misrepresentation claim. Both claims rest on misrepresentations about UBS's capabilities.

The complaint alleges that UBS misrepresented "that UBS possessed the capability to design, implement, and deliver a fully integrated ERP system with the specific capability and functionality to meet Five-Star's business requirements and address Five-Star's business processes and to do so within eight months of the start of the project." *See* Cplt., at ¶ 53 (Dckt. No. 1).

The difference is the allegation of negligence, instead of intentional fraud. In the negligence-misrepresentation claim, Five-Star alleges that UBS "had a duty to exercise

17

reasonable care to ensure its representations were accurate" because of its "superior knowledge of its software and its purported ability to customize, configure, and implement the software for Five-Star." *Id.* at ¶¶ 60–61. UBS breached that duty by making false representations. *Id.* at ¶ 53.

The complaint includes specific allegations about damages. Five-Star "paid UBS substantial sums of money and did not receive any value or benefit for those payments." *Id.* at ¶ 65. Five-Star "sustained a loss of profits and loss of business growth from 2022 to the present." *Id.* Five-Star "was forced to divert thousands of hours of employee time, and additional expenses, in a futile attempt to cause UBS to deliver a software product that UBS was not capable of producing," and was "forced to incur the cost of selecting, procuring, and implementing a replacement system." *Id.* at ¶¶ 67–68.

UBS moved to dismiss based on the economic loss doctrine, also known as the *Moorman* doctrine. Under the *Moorman* doctrine, a plaintiff cannot recover purely economic losses in tort. *See Moorman Manufacturing Co. v. National Tank Co.*, 435 N.E.2d 443, 448, 451–52 (Ill. 1982). Economic losses include "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits – without any claim of personal injury or damage to other property." *Id.* at 449.

Five-Star alleges that it suffered economic losses from the negligent misrepresentation. Five-Star says that it paid money without receiving any value or benefit in return. *See* Cplt., at ¶ 65 (Dckt. No. 1). Five-Star suffered a "loss of profits" and a "loss of business growth." *Id.* at ¶ 66. It lost "employee time" and had to pay "additional expenses." *Id.* at ¶ 67. So the economic loss doctrine forecloses the claim, unless an exception applies.

The Illinois Supreme Court has recognized two exceptions to the economic loss doctrine. Neither exception applies here.

The first exception involves intentional misrepresentations. *See Moorman*, 435 N.E.2d at 452 (recognizing that "economic loss is recoverable where one intentionally makes false representations"). That's why the intentional fraud claims can survive. But a carve-out for intentional acts cannot save a negligence claim, like Five-Star's negligent-misrepresentation claim. So the first exception doesn't apply.

Under the second exception, "economic loss is recoverable . . . where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations." *Id.* (citing *Rozny v. Marnul*, 250 N.E.2d 656 (Ill. 1969)).

The second exception has two parts. "First, the defendant must supply the information in the course of his business and second, the information must be supplied for the guidance of others in their business transactions." *Rankow v. First Chicago Corp.*, 870 F.2d 356, 362 (7th Cir. 1989). In conducting this "case-by-case analysis," courts focus "on the nature of the information and its relation to the particular type of business conducted." *Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*, 125 F.3d 468, 475 (7th Cir. 1997).

On the first prong, the key question is "whether the defendant is in the business of supplying information for the guidance of others, or whether the information that is supplied is merely ancillary to the sale or in connection with the sale of merchandise or other matter." *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1201 (Ill. 1997). This question is relevant to whether the case falls within the negligent-representation exception, and to whether there is a duty at all (as required to state a claim of negligence). *See Dvore v. Casmay*, 2008 WL 4427467, at *6 (N.D. Ill. 2008) (Dow, J.).

Courts "envision a continuum [of enterprises] with pure information providers at one end and pure tangible good providers at the other." *Tolan and Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 296–97 (Ill. App. Ct. 1999) (alteration in original).

Just about every business provides information, in one form or another. It's hard to buy anything from anybody without getting information of some kind.

The question is whether the information *is* the product, or whether the company provides the information to support the sale of something else. Companies fall at different places along the spectrum.

If the defendant is in the business of providing knowledge to help others, then the defendant is closer to the information end of the spectrum. But if the defendant incidentally provides information, then the defendant is closer to the tangible-good end of the spectrum. The question is whether the defendant is a sherpa, of sorts, meaning a person in the business of guiding others by providing information.

"At the pure information end [of the spectrum] are accountants and attorneys, insurance brokers, stockbrokers, real estate brokers, termite inspectors, and environmental assessors." *Id.* at 297 (citations omitted) (collecting cases). Meanwhile, "[a]t the tangible product end are *manufacturers of* computers and *software*, manufacturers of products of any type, and sellers of crop sprayers." *Id.* (emphasis added) (citations omitted) (collecting cases). Finally, "[b]etween are the difficult cases, which include life insurance companies, banks and financial service providers, and financing inspectors." *Id.* (citations omitted) (collecting cases).

The tangible-product end of the spectrum is for businesses that supply tangible goods or non-informational goods or services. While these kinds of businesses "may exchange

20

information, the information relates only to the goods or services and, thus, is supplied incidental to the sale of the product." *Tolan*, 719 N.E.2d at 299 (cleaned up).

A few examples illustrate the point. In *Congregation of the Passion v. Touche Ross & Co.*, 636 N.E.2d 503 (Ill. 1994), the plaintiff brought malpractice claims against an accountant, alleging a breach of care in the preparation of financial statements. The Illinois Supreme Court held that the accountant was in the business of supplying information. *Id.* at 515.

The Seventh Circuit addressed a situation closer to the other end of the spectrum in *Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*, 125 F.3d 468 (7th Cir. 1997). There, the defendant's primary business was the manufacture and sale of machines. But the defendant also provided appraisals of equipment. *Id.* at 476.

The Seventh Circuit held that the defendant was not in the business of supplying information. The information wasn't the product – the information was secondary to the product. "Taylor provided information about its goods so that somebody could determine whether to acquire the goods." *Id.*

UBS is not in the business of supplying information for the guidance of others. UBS makes and licenses R2 software. *See* Agreement, at 2 (Dckt. No. 1-1) ("[Five-Star] agrees to (i) license UBS's proprietary software known as R2 ('Software')[,] (ii) purchase recurring services including hosting, maintenance and subscription modules related to the Software, and (iii) implementation services.").

Software is less tangible than, say, a bucket of hammers. Software isn't a physical object. Still, UBS is closer to the tangible-product end of the spectrum of providers, because software is a product, not information.

UBS did provide information to Five-Star, including information about the capabilities of UBS and the feature of its software. *See, e.g.*, Cplt., at ¶ 53 (Dckt. No. 1). But that information was incidental to the sale of another product – the R2 software system.

True, the R2 software system itself provides information to an organization. As Five-Star points out, the R2 software "furnishes businesses with critical information regarding their sales, inventory, billing, logistics, and customers." *See* Pl.'s Resp. in Opp. to Mtn. to Dismiss, at 9 (Dckt. No. 19). But the question is not whether the product helps to manage information. The question is whether the provider is in the business of providing information to guide others.

At the end of the day, UBS provides software, and software is a product. The fact that the product facilitates the flow of information does not mean that UBS is in the business of providing information for the guidance of others.

That said, another court reached a different conclusion on a similar issue. *See Central Dupage Health v. 3M Co.*, 2005 WL 2848396 (N.D. Ill. 2005). In that case, 3M sold Central Dupage Health ("CDH") a software system that included "a clinical data repository, a master patient index, a healthcare data dictionary, a clinical workstation, and alert management software components." *Id.* at *1.

CDH alleged that "what mostly set 3M apart was the clinical workstation application," which included "physician inbox, messaging, order entry, documentation[,] and document signing." *Id.* But the system didn't work as promised, so CDH sued 3M. *Id.* at *2.

3M moved to dismiss based on the *Moorman* doctrine. The court concluded that the doctrine did not apply because 3M was in the business of supplying information. The opinion offered little more than a bottom-line conclusion: "At this stage of litigation, CDH has

sufficiently pled that 3M is in the business of supplying information and falls within the exception cited above." *Id.* at *4.

This Court sees things differently. Information may be an essential component of software. Selling software isn't the same thing as selling a tangible object. But selling software isn't the same thing as selling knowledge, advice, expertise, or other information to guide someone else.

For the exception to apply, "the information must be supplied for the guidance of others in their business transactions." *Rankow*, 870 F.2d at 362. As this Court sees things, a seller of software isn't in the business of supplying information for the guidance of others.

Five-Star has not satisfied either exception to the economic loss doctrine. So the negligent-misrepresentation claim is dismissed.

## III.     Breach of Contract (Count IV)

The next claim is a breach-of-contract claim. The gist of the claim is that UBS didn't deliver what it promised.

Five-Star alleges that it "entered into the Agreement with UBS in which Five-Star initially agreed to pay UBS certain sums of money in exchange for licensing, supporting, hosting, implementing[,] and configuring the R2 software." *See* Cplt., at ¶ 83 (Dckt. No. 1). Five-Star asserts that "UBS failed to implement, host[,] or upgrade the R2 software," and that "UBS breached the Agreement by providing an incomplete and unusable product that was missing key functionality." *Id.* at ¶¶ 84–85.

Both parties agree that New York law governs the contract. *See* Agreement, at 10 (Dckt. No. 1-1) ("This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to conflicts of law principles.").

23

To state a claim for breach of contract under New York law, a plaintiff must allege that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023) (quoting *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282 (N.Y. 2022)). A plaintiff must identify "the specific provisions of the contract upon which liability is predicated." *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 350 (S.D.N.Y. 2021).

Five-Star alleges that the contract required UBS to license, support, host, implement, and configure the R2 software. *See* Cplt., at ¶ 83 (Dckt. No. 1). But UBS "failed to implement, host[,] or upgrade the R2 software." *Id.* at ¶ 84.

UBS points out that the complaint does not point to any specific contractual provisions when it alleges a breach. In UBS's view, the lack of specificity requires dismissal. *See* Mtn. to Dismiss, at 9–10 (Dckt. No. 11).

"New York law and the *Twombly-Iqbal* standards of federal pleading require a complaint to identify, in non-conclusory fashion, the specific terms of the contract that a defendant has breached. Otherwise, the complaint must be dismissed." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 131 (S.D.N.Y. 2015) (collecting cases).

New York courts have dismissed complaints that offered only "broad, conclusory, and sometimes contradictory assertions about what the [contracts] either did not allow or did not address." *See Trustpilot Damages LLC v. Trustpilot, Inc.*, 2021 WL 2667029, at *8 (S.D.N.Y. 2021); *see also Spinelli*, 96 F. Supp. 3d at 131 ("The Court cannot 'supply a specific obligation the parties did not spell out.'").

24

That said, a lack of specificity ordinarily does not lead to a dismissal with prejudice. Most of the time, courts grant leave to amend. *See, e.g.*, *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001); *Cellucci v. O'Leary*, 2020 WL 977986, at *9–10 (S.D.N.Y. 2020) (giving the plaintiffs leave to amend where the plaintiffs did not "allege the terms of the five contracts at issue, attach[] copies of those agreements (if they were written), or even summarize[] the essential terms with some specificity").

Courts have dismissed with prejudice only when the allegations contradict the plain terms of the contract. *See, e.g.*, *Ally Fin., Inc. v. Comfort Auto Group NY LLC*, 2021 WL 4033249, at *5 (E.D.N.Y. 2021) ("Comfort Auto's breach of contract claim fails even if the Court were to consider the [contract] . . . [because the defendant's] actions are expressly authorized in the [contract]."); *Trustpilot*, 2021 WL 2667029, at *8 ("The Amended Complaint offers broad, conclusory, and sometimes contradictory assertions about what the [contract] either did not allow or did not address . . . . Indeed, the terms of the contracts themselves do not support any of plaintiffs' breach of contract claims."); *Quintanilla*, 541 F. Supp. 3d at 350 ("[The plaintiff's] breach-of-contract claim fails for the straightforward reason that her contract with [the defendant] does not mention, let alone promise, [the alleged breach]."); *Spinelli*, 96 F. Supp. 3d at 132 ("In fact, Plaintiffs' conclusions are contradicted by the actual terms of the [contract].").

Here, Five-Star alleges that UBS breached the contract. But the complaint describes the breach in general terms, without alleging that UBS breached any specific provision. That is, Five-Star does not allege that UBS breached Provision X, Y, or Z.

New York law requires more specificity, so the breach-of-contract claim is dismissed without prejudice. The Court will give Five-Star a chance to amend and provide more

specificity. The allegations are not inconsistent with the plain terms of the contract, so there is no basis to dismiss the claim with prejudice.[3]

## IV.    Breach of the Covenant of Good Faith and Fair Dealing (Count V)

The fifth claim involves the implied covenant of good faith and fair dealing.

The covenant of good faith and fair dealing in the course of contract performance is implied in all contracts under New York law. *See Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). That covenant includes the promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.*

"New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). In other words, the same facts cannot give rise to both a claim for breach of contract and a claim for breach of the implied duty of good faith and fair dealing. *Friedman v. Maspeth Fed. Loan and Savings Ass'n*, 30 F. Supp. 3d 183, 195 (E.D.N.Y. 2014). But if "the facts supporting each claim are not identical," both claims can proceed. *Id.*

Five-Star alleges that UBS breached the covenant of good faith and fair dealing in two different ways. First, UBS "fail[ed] to implement, design, and develop a replacement software

---

[3]  As an aside, UBS discusses the fact that the Agreement contains an express limitation-on-liability provision that bars any special, incidental, and consequential damages. *See* Mtn. to Dismiss, at 10 (Dckt. No. 11). But under New York law, "[a] party may invalidate a contract, including any contractual limitation on liability, by proving that it was induced to enter the contract under fraudulent pretenses." *Sanmina Corp. v. Dialight plc*, 2023 WL 9022882, at *7 (S.D.N.Y. 2023); *see also Kearins v. Panalpina, Inc.*, 2012 WL 13098077, at *4 (E.D.N.Y. 2012). Five-Star also brings a fraudulent-inducement claim. *See* Cplt., at ¶¶ 71–81 (Dckt. No. 1). That claim survives dismissal. So, for now, the limitation-on-liability provision does not limit the recoverable damages, because Five-Star alleges that UBS procured the contract through fraud.

product that met Five-Star's requirements and business process." *See* Cplt., at ¶ 95 (Dckt. No.
1). Second, UBS "withh[e]ld[] from Five-Star information needed by Five-Star to decide
whether it wanted to devote more resources to the project, pause the project, or terminate the
project." *Id.*

Five-Star's first allegation about the covenant of good faith and fair dealing sounds a lot
like its breach-of-contract claim. *Compare* Cplt., at ¶ 95 (Dckt. No. 1) ("UBS . . . fail[ed] to
implement, design, and develop a replacement software product that met Five-Star's
requirements and business processes."), *with id.* at ¶ 84 ("UBS failed to implement, host[,] or
upgrade the R2 software."). So, the Court dismisses Five-Star's claim to the extent that it rests
on the same failure to perform.

That said, Five-Star's second allegation is based on different facts. Five-Star alleges that
UBS breached the covenant of good faith and fair dealing by "withholding from Five-Star
information needed by Five-Star to decide whether it wanted to devote more resources to the
project, pause the project, or terminate the project." *Id.* at ¶ 95. The complaint alleges that
withholding information deprived Five-Star of the fruits of its agreement.

The allegation about withholding information is distinct from the allegations about
non-performance more generally. So, for now, the claim survives to the extent that it alleges the
withholding of information.

## V.    Breach of Express Warranty (Count VI)

The sixth claim is a breach-of-warranty claim.

"To state a claim for breach of express warranty under New York law, a plaintiff must
allege (1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance
on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty,

and (4) injury to the buyer caused by the breach." *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014).

Five-Star alleges that UBS breached two express warranties in the contract. *See* Cplt., at ¶¶ 101–03 (Dckt. No. 1).

The first warranty is about performing in a workmanlike manner. Section 8.2(b) of the Agreement provides that "UBS warrants that and [sic] services (Professional Services and Recurring Services) provided under this Agreement will be performed in a good and workman like [sic] manner in accordance with industry standards." *See* Agreement, at 9 (Dckt. No. 1-1); *see also* Cplt., at ¶ 101 (Dckt. No. 1).

"'Professional Services' means the professional services set forth on the Order Form to implement the Software, customize the software and/or train the Client in use of the Software." *See* Agreement, at 4 (Dckt. No. 1-1). "'Recurring Services' means Support and Maintenance Services, subscription Software, and hosting services set forth on the Order Form to be provided by UBS to Client on an annual basis." *Id.*

The second warranty is about the software conforming to the specifications. Section 8.2(a) says that "UBS warrants the Software will conform to the specifications set forth in the Documentation for a period of ninety (90) days after installation." *See* Agreement, at 9 (Dckt. No. 1-1); *see also* Cplt., at ¶ 102 (Dckt. No. 1).

The complaint alleges that Five-Star "br[ought] to UBS's attention its failure to comply with the express warranties contained in the Agreement." *See* Cplt., at ¶ 104 (Dckt. No. 1). But UBS was unable to timely make the necessary changes to the R2 software or its provision of services to comply with its warranted obligations." *Id.*

28

The existence of a warranty is not at issue. Instead, UBS argues that Five-Star has not adequately pleaded the second or third elements of the claim: reliance and breach.

When it comes to reliance, UBS thinks that Five-Star has not alleged that it "relied on either of the express warranties," or "that its reliance on the express warranties was a basis for its contract with UBS." *See* Mtn. to Dismiss, at 12 (Dckt. No. 11). The Court disagrees.

Under New York law, "[t]he critical question is not whether the buyer believed in the truth of the warranted information . . . but whether it believed it was purchasing the seller's promise as to its truth." *CBS Inc. v. Ziff-Davis Publ'g Co.*, 553 N.E. 997, 1000–01 (N.Y. 1990) (cleaned up). In other words, a plaintiff needs to allege only "reliance on the existence of the warranty as part of the sales contract." *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 229 (S.D.N.Y. 2005).

The complaint alleges that Five-Star relied on some of UBS's allegedly fraudulent representations in entering into the contract. *See, e.g.*, Cplt., at ¶ 42 ("Based on UBS's superior knowledge of the R2 software, and UBS's purported ability to customize, configure, and implement the R2 software for Five-Star, Five-Star reasonably relied on UBS's misrepresentations and entered into the Agreement with UBS and continued its contractual relationship with UBS."); *see also id.* at ¶¶ 60, 80 (same).

The complaint does not come out and say that it relied on these two warranties when it decided to enter into the contract. But the complaint does allege that it relied on the representations about the software, albeit in general terms.

That's good enough for notice pleading. UBS is on notice about the nature of the claim. And the complaint contains enough facts to give rise to a plausible inference that Five-Star is entitled to relief.

The Court lands in the same place when it comes to the third element, the existence of a breach.

The complaint alleges that UBS breached the express warranties.  *Id.* at ¶ 103.  And the complaint backs up that conclusion with additional allegations.

"UBS was unwilling to engage with Five-Star on finding a proper solution so that Five-Star could use the R2 software."  *Id.* at ¶ 105.  And "UBS's unwillingness or inability to address these issues does not comport with UBS's obligation to provide services in accordance with industry standards as warranted in the Agreement."  *Id.*

The complaint alleges that UBS breached the warranties because of its "inability to address these issues," and because it "fail[ed] to deliver the R2 software in conformance with the Documentation."  *Id.* at ¶¶ 106–07.

Other paragraphs of the complaint describe how UBS failed to live up to its end of the deal.  Overall, the complaint contains more than enough detail to allege a breach of the express warranties.

In their briefs, the parties get embroiled in a debate about what "Documentation" and "installation" mean under the Agreement.  For example, UBS argues that it could not have breached the provision about providing services within 90 days of installation, because it never completed the installation.

The parties have spotted a few questions of fact, but a motion to dismiss is not the right time to answer them.  For now, the express warranty claim survives.

## VI.    Unjust Enrichment (Count VII)

The seventh claim is unjust enrichment.

Five-Star brings that claim in the alternative to its breach-of-contract contract claim. Five-Star alleges that, if there was no contract, it would be unjust for UBS to keep the money that Five-Star paid because UBS didn't deliver what it promised. *See* Cplt., at ¶¶ 109–14 (Dckt. No. 1).

UBS argues that Five-Star cannot bring an unjust-enrichment claim if it is also bringing a breach-of-contract claim. After all, a breach-of-contract claim presupposes the existence of a contract, and an unjust-enrichment claim presupposes the non-existence of a contract.

A complaint can plead claims in the alternative. *See* Fed. R. Civ. P. 8(d)(3). "Therefore, under the federal procedural rules, [Five-Star] may allege . . . [an] unjust enrichment . . . claim[] in the alternative to its breach of contract claim[] even though it cannot recover under both breach of contract and quasi-contract theories." *Wabash Castings, Inc. v. Fuji Machine Am. Corp.*, 2016 WL 4765717, at *2 (N.D. Ill. 2016) (St. Eve, J.) (citing *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 623 (N.D. Ill. 2008)).

For now, the unjust-enrichment claim survives.

## VII. Illinois Consumer Fraud Act (Count VIII)

The eight claim alleges a violation of the Illinois Consumer Fraud Act.

The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including . . . deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce." *See* 815 ILCS 505/2.

To state a deception claim under the ICFA, a complaint must allege: "(1) that the defendant engaged in a deceptive or unfair practice; (2) with the intent that the plaintiff (or

others) rely on the deception; (3) that the act occurred in the course of trade or commerce; and (4) that the deception caused actual damages." *Kahn v. Walmart, Inc.*, 107 F.4th 585, 598 (7th Cir. 2024).

Five-Star's ICFA claim is similar to its fraudulent-misrepresentation claim. Five-Star alleges that "UBS employed unfair and deceptive acts and practices when it demonstrated the R2 software to Five-Star" and "made misrepresentations to Five-Star." *See* Cplt., at ¶¶ 120–21 (Dckt. No. 1). Five-Star also alleges that UBS intended for Five-Star to rely on its deception. *Id.* at ¶ 122.

UBS raises two challenges. First, UBS thinks that the ICFA claim should be dismissed as duplicative of Five-Star's breach-of-contract claim. The Court disagrees.

Five-Star's claim is not duplicative of its breach-of-contract claim, for the same reasons that Five-Star's fraud-based claims (fraudulent misrepresentation and fraud in the inducement) are not duplicative of its breach-of-contract claim. *See supra* section I.B. Five-Star's fraud-based claims are about representations that are separate from the express terms of the contract.

It is true that the ICFA is "not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy." *Greenberger*, 631 F.3d at 399 (quoting *Zankle*, 724 N.E.2d at 992–93). But here, for the reasons explained above, Five-Star's fraud-based claims are distinct from the underlying breach-of-contract allegations. So, the ICFA claim is not duplicative.

Second, UBS thinks that Five-Star has not satisfied the pleading standards and plausibly alleged any misrepresentations. Again, the Court disagrees.

True, the paragraphs in the ICFA claim leave a little something to be desired. Five-Star alleges that "UBS employed unfair and deceptive acts and practices when it demonstrated the R2

software to Five-Star" and "made misrepresentations to Five-Star." *See* Cplt., at ¶¶ 120–21 (Dckt. No. 1). Those statements are conclusory. If the complaint contained nothing else, this claim might not live to see the light of day.

But courts must read a complaint as a whole. *See Horton v. City of Chicago*, 2014 WL 5473576, at *2 (N.D. Ill. 2014) ("The Court reads the complaint and assesses its plausibility as a whole."); *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).

Elsewhere, the complaint contains plenty of allegations of misrepresentations.

Again, the misrepresentations allegedly took place during four video conferences in 2022, and during the live demonstration in Sea Island, Georgia in 2023.

Five-Star alleged that Khosla, Pasco, and Garcia misrepresented the capabilities of the R2 software at the online video conferences. *See* Cplt., at ¶¶ 10–11 (Dckt. No. 1). At the live video conference, UBS showed off a range of features of the R2 software. *Id.* at ¶¶ 12–14.

Five-Star didn't know that the software was demonstration software, not software that used live data. *Id.* at ¶ 16. And UBS never disclosed that the demonstration software was not the base "off-the-shelf" software (thus Five-Star would need a lot of expensive configurations to make the software work for its purposes). *Id.* at ¶ 17.

UBS argues that Five-Star does not "distinguish which unidentified statements or omissions it believes constitute deceptive acts versus unfair conduct." *See* Mtn. to Dismiss, at 14 (Dckt. No. 11). But under the ICFA, a practice can be both "deceptive *and* unfair." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646–47 (7th Cir. 2019). It is possible to read the complaint to allege that the misrepresentations were deceptive, or unfair, or both.

Five-Star's claim under the ICFA survives.

## VIII. New York General Business Law § 349 (Count IX)

The ninth and final claim falls under New York General Business Law § 349. *See* Mtn. to Dismiss, at 15 (Dckt. No. 11).

That statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service *in this state*." N.Y. Gen. Bus. Law § 349 (emphasis added). Importantly, the allegedly deceptive act or practice "must [have] occur[red] in New York" to be prohibited by section 349. *See Goshen v. Mutual Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002).

Five-Star has not alleged that any of the misrepresentations happened in New York. So, Five-Star's allegations do not state a claim under section 349. The Court dismisses Five-Star's claim under section 349.

In a footnote, Five-Start asks for leave to amend this claim. *See* Pl.'s Mem. in Opp. to Mtn. to Dismiss, at 15 n.6 (Dckt. No. 19). That request is granted.

### Conclusion

Defendant UBS's motion to dismiss is granted in part and denied in part. Count I (fraudulent misrepresentation), Count III (fraud in the inducement), Count VI (breach of express warranty), Count VII (unjust enrichment), and Count VIII (ICFA) survive. Count II (negligent misrepresentation), Count IV (breach of contract), and Count IX (NY General Business Law) are dismissed without prejudice. Count V (breach of the covenant of good faith and fair dealing) is dismissed without prejudice to the extent that it is duplicative of the breach-of-contract claim but survives to the extent that it is not duplicative.

Date:  March 3, 2025

_____

Steven C. Seeger
United States District Judge